Aryon WILLIAMS, Jr., Petitioner,

v.

Dora B. SCHRIRO, et al., Respondents.

Civ. 97–1239–PHX–PGR.

United States District Court,
D. Arizona.

March 20, 2006.

Julie Singleton Hall, Denise I. Young, Tucson, AZ, Fredric F. Kay, Federal Pub-

lic Defender's Office, Phoenix, AZ, for Petitioner.

Dawn Marie Northup, Office of Attorney General, Capital Litigation Section, Phoenix, AZ, for Respondents.

## ORDER RE: CLAIM 16

ROSENBLATT, District Judge.

Petitioner Aryon Williams, Jr. ("Petitioner") is a state prisoner under sentence of death for the first degree murder of Rita DeLaO. Before the Court is Petitioner's Motion for Discovery, Expansion of the Record and Evidentiary Hearing on Claim 16. (Dkt. 96.)[1] Claim 16 alleges that the state violated Petitioner's right to a fair trial under *Brady v. Maryland* by withholding exculpatory evidence that another potential suspect existed for De-LaO's murder. Respondents filed an opposition to the motion and Petitioner filed a reply. (Dkts. 99, 100.)

### *FACTUAL BACKGROUND*

On June 23, 1992, Petitioner was convicted of armed robbery and the attempted murder of Norma Soto, as well as the murder of Rita DeLaO. Because Claim 16 relates solely to the murder of Ms. DeLaO, the following factual background primarily concerns that crime.

On Saturday, January 27, 1990, Petitioner and Rita DeLaO, his former girlfriend and mother of one of his children, spent part of the day together and made plans for Rita to spend the night at his apartment. *State v. Williams*, 183 Ariz. 368, 371–72, 904 P.2d 437, 440–41 (1995). At the time, Petitioner lived in an apartment with Michelle Deloney, his girlfriend and mother of his other child. *Id.* at 372, 904 P.2d at 441. After midnight, Rita telephoned and stated she wanted to come over to the apartment; Petitioner told her not to come because Michelle was there.

*Id.* Rita called a second time and said she was coming over to the apartment, which she did around 3:00 a.m. *Id.* Petitioner joined Rita outside the apartment, where they argued. *Id.* Rita confronted Petitioner with a gun and he disarmed her. *Id.*

Several hours later that morning, Rita's body was found on a dirt road in Arizona City, approximately twenty minutes by car from Petitioner's apartment. *Id.* Rita had been shot in the elbow and twice in the thigh, she had sustained multiple blunt force injuries, she had been dragged and it appeared she had been run over by a car. *Id.* Bullets recovered from her body were consistent with the caliber weapon Rita had displayed earlier that morning outside Petitioner's apartment. *Id.*

The next day, Monday, January 29, Petitioner told Michelle he thought he had seen Rita's car near a park and they drove by it. *Id.* Petitioner told a Pinal County Sheriff's technician who was processing the car that he thought it was Rita's and that he had last seen her around 3:15 a.m. Sunday morning. *Id.* Petitioner's fingerprints were found on the exterior of Rita's car and blood was found inside, some of which was matched by type and enzyme marker to Rita, and on the underside of the car. *Id.* at 373, 904 P.2d at 442. Petitioner voluntarily went to the Casa Grande Police Department, where he was interviewed and informed that Rita was dead. *Id.* at 372–73, 904 P.2d at 441–42. A detective returned to Petitioner's apartment with him and, with consent, conducted a search and seized all of Petitioner's dirty clothing. *Id.* at 373, 904 P.2d at 442. Michelle told the detective that Petitioner was at home during the time of the murder. *Id.*

The morning of March 5, 1990, Michelle informed Petitioner that the police were

---

**1.** "Dkt." refers to the documents in this   Court's case file.

looking for him in connection with a shooting the night before. *Id.* at 374, 904 P.2d at 443. Petitioner denied involvement to Michelle, but gave his gun to her to hide along with some cash. *Id.* Michelle was stopped while driving away and the gun and money were recovered. *Id.* Petitioner was arrested that day for the attempted murder of Norma Soto; Michelle then implicated him in the murder of Rita. *Id.* The facts as set forth up to this point are, in essence, uncontested.

Michelle testified to the following at Petitioner's trial. After going outside to see Rita, Petitioner came back into the apartment, took his keys and left, not returning until 7 or 8 a.m. (RT 5/15/9 at 154.)[2] When he left he was wearing gray stonewashed jeans (*id.* at 152), but when he returned he was wearing gray sweatpants and a blue scrub top that Michelle had never seen before (*id.* at 156–57); she lied when she initially told a detective that Petitioner was wearing gray sweatpants when Rita came to the apartment (RT 5/20/92 at 95–96, 100–01, 102). At some point, Petitioner told Michelle that he burned the clothes he had been wearing. (RT 5/19/92 at 5.) Michelle saw Rita's shoes on the kitchen floor Sunday morning, but they were gone later in the day (*id.* at 155–56); prior to trial, Michelle had not told law enforcement or defense counsel that she saw Rita's shoes in the apartment (RT 5/21/92 at 8).

Michelle also testified to the following at Petitioner's trial. After the first police interview at the apartment, Petitioner told her to tell police that he was with her all night. (RT 5/15/92 at 171.) At some point, he also told her and his parents that he knocked Rita down after she brandished the gun and that she hit her head and was bleeding outside the apartment. (RT 5/15/92 at 175.) The day after Rita died, Petitioner told Michelle that friends

of his had killed Rita in his presence, but that he had only kicked her in the face. (*Id.* at 164–65.) A few weeks later, Petitioner admitted to Michelle that he had killed Rita; specifically, that he had shot her in the arm and side, hit her in the head with a pole and iron, and ran back and forth over her. (RT 5/19/92 at 19–20.) According to Michelle, after Petitioner confessed to her, he threatened to kill her if she ever told anyone. (*Id.* at 21.)

At trial, Michelle acknowledged feeling pressured during the March 5 police interview, after the gun and cash were recovered from her, because police accused her of lying and warned her to tell the truth if she wanted to see her son again and avoid the risk of being charged with a crime and getting into big trouble; she admitted that she felt afraid and threatened, and knew by the questioning what the officers wanted ed to hear. (RT 5/20/92 at 154–55, 173–77.) Further, she acknowledged that she had talked to Petitioner five to ten times in March 1990, while he was in jail, and that their discussions were not threatening, but focused on getting married and their son. (*Id.* at 192–93.) While from March to November, Petitioner did not have a number at which to contact her (*id.* at 193–94), between November 1990 and early January 1991, Michelle accepted numerous collect calls from Petitioner, who remained jailed, and he never threatened her or tried to influence her behavior regarding the case (*id.* at 199–205, 215).

To counter Michelle's testimony, Petitioner testified that after disarming Rita he returned the gun to her and she drove away uninjured. (RT 6/18/92 at 166, 172.) He denied ever threatening Michelle or telling her that he had killed Rita. (*Id.* at 182, 231.) He testified that one of Rita's brothers told him how Rita was murdered, which he relayed to Michelle. (*Id.* at 227;

---

**2.** "RT" refers to the reporter's transcripts from Petitioner's trial.

RT 6/19/92 at 52–53.) Rita's brother testified that although he did have phone conversations with Petitioner, he did not tell him how Rita died. (RT 6/10/92 at 241.) Two of Petitioner's co-workers testified that he told them that Rita came to his house with a gun, which he took away, and that her body was found and she had been shot, beat up and run over. (RT 5/22/92 at 15, 19–20.)

On Sunday afternoon, January 28, Petitioner took his son to Phoenix as was the standard arrangement with Rita, and dropped him at Rita's parents' home. (RT 6/18/92 at 193.) Members of Rita's family, who never liked Petitioner (RT 6/10/92 at 238; RT 6/11/92 at 58), testified that they drove to the Williams's house that night and Petitioner told them they would never find Rita and he would get custody of his son (RT 6/11/92 at 47–48, 50; RT 6/22/92 at 45–46). Members of Petitioner's family, and Petitioner, testified that he never made such statements. (RT 6/12/92 at 129; 6/16/92 at 80–81, 239; RT 6/18/92 at 201.)

### EXHAUSTION AND PROCEDURAL DEFAULT

Because this case was filed after April 24, 1996, it is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA"). *Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Woodford v. Garceau,* 538 U.S. 202, 210, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003). The AEDPA requires that a writ of habeas corpus not be granted unless it appears that the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thomp-*

son, 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). To properly exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which his claim is based so that the state courts have a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim. *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Picard v. Connor,* 404 U.S. 270, 277–78, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

On September 26, 2002, this Court granted Petitioner's request for a stay to allow him to raise a claim in state court based on *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). (Dkt. 63.) Petitioner filed a notice of post-conviction relief ("PCR") in the Pinal County Superior Court on October 15, 2002. (*See* ROA–PCR 10/15/02 Notice.)[3] That court ordered that a PCR petition be filed by November 29, 2002. (ROA–PCR 10/30/02 ME.) On November 29, Petitioner requested an extension until January 28, 2003, to file the petition, citing counsel's workload, the Thanksgiving holiday and counsel's upcoming vacation, and the need to obtain court authorization of additional hours for counsel to complete the work. (ROA–PCR 11/29/02 Mot.) On December 23, 2002, the trial court denied the request to extend time. (ROA–PCR 12/23/02 ME.) Petitioner filed a PCR petition on January

---

**3.** "ROA–PCR" refers to the record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR–03–0215–PC). "PR Doc." refers to the Arizona Su-

preme Court's docket for that petition. "ME" refers to minute entries from those PCR proceedings. On March 21 and June 7, 2005, the Court received copies of these records from the state courts. (Dkts. 82, 97.)

30, 2003. (ROA–PCR 1/30/03 Pet.) The PCR court dismissed the petition as untimely, pursuant to Arizona Rule of Criminal Procedure 32.4(c). (ROA–PCR 2/6/03 ME.) The PCR court denied Petitioner's motion for reconsideration of the dismissal on May 14, 2003 (ROA–PCR 5/14/03 ME), and the Arizona Supreme Court declined review on February 10, 2004 (PR Doc. 23). This Court granted amendment of Petitioner's habeas petition to add a *Brady* claim and ordered briefing on the procedural status and merits of the claim. (Dkt. 81.)

■ Respondents argue Claim 16 is procedurally defaulted because it was dismissed in state court based on an adequate and independent procedural bar.[4] A habeas petitioner's claim may be precluded from federal review if it was raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman,* 501 U.S. at 729–30, 111 S.Ct. 2546. Such claims will be found procedurally defaulted in federal court so long as the state procedural bar was independent of federal law and adequate to warrant preclusion of federal review. *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989).

Petitioner contends that the bar applied to Claim 16 in state court was not adequate.[5] A state bar is not adequate unless it was firmly established and regularly followed at the time of application by the state court. *Ford v. Georgia,* 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991). More specifically, a state rule is adequate only if it is "clear, consistently applied, and well-established." *Wells v.*

*Maass,* 28 F.3d 1005, 1010 (9th Cir.1994). The state bears the ultimate burden of demonstrating that a state procedural bar is adequate. *See Bennett v. Mueller,* 322 F.3d 573, 585–86 (9th Cir.2003) (holding that once the state pleads the existence of an adequate and independent bar, the burden shifts to petitioner; however, the ultimate burden always resides with the state).

■ The question before the Court is whether, at the time of Petitioner's successive PCR proceeding, there was a clear, well-established and regularly followed rule that a capital PCR petition was subject to dismissal for lack of good cause in seeking a first extension of time to file a petition. Under Arizona Rules, a successive PCR petition in a capital case "shall" be filed within thirty days of the filing of the notice of PCR. Ariz. R.Crim. P. 32.4(c). The rule further provides, however, that for "good cause" a defendant may be granted an initial sixty-day extension and additional thirty-day extensions. *Id.* In the event a petition has not been filed within 180 days of the notice, counsel shall file a status of the proceedings in the supreme court. *Id.*

There are no published opinions applying or construing Rule 32.4(c) in a capital case, and none in non-capital cases upholding a dismissal pursuant to Rule 32.4(c). *Cf. Montgomery v. Sheldon,* 181 Ariz. 256, 261, 889 P.2d 614, 619 (1995) (reversing for abuse of discretion PCR court's Rule 32.4(c) dismissal of petition in non-capital case and finding good cause for extension to file pro se petition based on appointed

---

4. In their opposition to Petitioner's motion for evidentiary development, Respondents also argue that Claim 16 is time-barred. Respondents did not raise a statute of limitations defense in their Answer to Third Amended Petition (*see* dkt. 93), therefore, that defense is waived. *See Nardi v. Stewart,* 354 F.3d 1134, 1141 (9th Cir.2004).

5. The parties have had two opportunities to brief this issue. The Court ordered the filing of supplemental briefs on the adequacy of the state bar in conjunction with Petitioner's motion to amend to add this claim to his petition (*see* dkts. 77–79), and the parties argued the issue again in the pleadings addressing Claim 16 (*see* dkts. 93 at 7–10, 95 at 2–33).

counsel's late notice to petitioner that he had not identified any meritorious arguments), *overruled in part on other grounds by State v. Smith,* 184 Ariz. 456, 459, 910 P.2d 1, 4 (1996). In contrast, Petitioner submitted twenty-eight unpublished PCR court orders granting capital petitioners a first continuance for the filing of their PCR petition. (*See* dkt. 80, ex. 1.) Several of the motions seeking an extension were filed on or after the petition's due date, and the reasons for the requested extensions ranged from counsel's workload and the need to complete record review and investigation, to counsel simply missing the deadline. (*Id.*) Petitioner also filed an unpublished order from the Arizona Supreme Court-in a case in which the PCR court dismissed a capital PCR proceeding for lack of a petition or motion for extension—granting petitioner a new notice of PCR to re-start the clock based on a good faith effort to timely file a motion for extension. (*Id.,* ex. 2.)

Respondents argue that Rule 32.4(c) is clear and straightforward. The Court disagrees. A state rule does not bar federal review if it is so unclear that it does not provide a reasonable opportunity to seek relief in state court. *See Morales v. Calderon,* 85 F.3d 1387, 1390 (9th Cir.1996). Rule 32.4(c) incorporates *express* provisions for extensions based upon good cause, but no criteria for good cause are provided. *Cf. Montgomery v. Sheldon,* 181 Ariz. 256, 261 n. 8, 889 P.2d 614, 619 n. 8 (1995) (reversing dismissal after finding that *"express* 'good cause' provision" of Rule 32.4(c) was satisfied). Based on the unpublished orders filed by Petitioner it appears that *every* first request for an extension of time in a capital case has been found to satisfy the good cause requirement. While the fact that a rule may require the exercise of judicial discretion does not in itself render the rule inadequate, the discretion must be exercised according to known standards. *Morales,*

85 F.3d at 1392. Rule 32.4(c) was not exercised consistently, if ever, to bar a capital petition as untimely. Further, the rule itself does not contain any explicit dismissal language; rather, it provides only that if a petition has not been filed after 180 days counsel should file a status report with the supreme court.

Based on the evidence before the Court, the rule was not firmly established; it appears that Petitioner's case was the first in which a state court dismissed a capital petition as untimely following the denial of an initial requested extension. *See Ford,* 498 U.S. at 423, 111 S.Ct. 850 ("Novelty in procedural requirements cannot be permitted to thwart review in this Court applied for by those who, in justified reliance upon prior decisions, seek vindication in state courts of their federal constitutional rights.") (quoting *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 457–58, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)). The Court finds that Respondents have not satisfied their burden of establishing that Rule 32.4(c), as applied in Petitioner's case, is an adequate bar to federal review of Claim 16. Therefore, Claim 16 will be reviewed on the merits.

### MOTIONS DISCUSSION

In Claim 16, Petitioner alleges the state violated his right to a fair trial by withholding exculpatory evidence. Specifically, Claim 16 alleges that the state was aware that a witness was willing to testify that another man may have murdered Rita De-LaO.

#### Law Governing Brady Claims

A successful *Brady* claim requires three findings: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the issue of guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215

(1963). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The question is whether the petitioner received a fair trial in the absence of the suppressed evidence, not whether it is more likely than not that the defendant would have been acquitted if the evidence had been disclosed. *See Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). In other words, the test is not sufficiency of the evidence, and "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434–35, 115 S.Ct. 1555.

### Summary of New Evidence

In a September 3, 1997 letter to Petitioner's PCR counsel, assistant attorney general Dawn Northup stated that she was enclosing letters recently found at the Pinal County Attorney's office. (Third Am. Pet., ex. A at 1.) Ms. Northup represented that neither the prosecutor nor the detective to whom most were addressed, Thomas Solis, recalled receiving or seeing the letters previously. (*Id.*) All seven of the letters were written and sent by Beverly Sweat, while she was in custody at the Pinal County Jail.

The initial letter, postmarked May 6, 1991, was sent to the Pinal County Sheriff Office, attn: homicide, attn: detectives or investigators and addressed "to whom this may concern." (*Id.* at 2.) In it, Ms. Sweat stated that she had information concerning a murder that was going to trial soon, which she was willing to exchange for early release and an outpatient drug program. (*Id.*) Between May 8 and June 7, 1991, Ms.

Sweat sent six more letters addressed to the Pinal County Sheriff, attention Thomas Solis. (*Id.* at 8, 10, 13, 16, 18.)

Two letters were dated May 7, 1991. (*Id.* at 4, 6.) In the first, Ms. Sweat talked about the murder of two men and information she received from a Jackie Ring; she went on to write that, "I'm going to get Yolanda to tell me the story about Rita and Patrick Fields." (*Id.* at 4–5.) She also suggested that Detective Solis try to question Milton Barnette, Jr. because his name had been mentioned by Yolanda and, while on the yard, "Aaron" had said that he was going to "get" Patrick Fields and Milton Barnette. (*Id.*) In the second letter, Ms. Sweat said that Yolanda had told her what happened the night Rita was killed. (*Id.* at 6.) According to Ms. Sweat, Yolanda said that she was walking down Trekle Road in Casa Grande and saw Patrick, who was all bloody, and he said that he had just killed Rita, that "Aaron" had paid him $1000.00, that he (Patrick) had a knife and cut out her eyes and used a moped to run her over. (*Id.*) According to Ms. Sweat, Yolanda said that she and Patrick burned the clothes he was wearing and spent the money. (*Id.*)

In the fourth letter, Ms. Sweat asked Detective Solis to see if he could get her into outpatient, rather than inpatient, rehabilitation so that she could be with her children, and to tell the County Attorney that she would do "whatever" to help him. (*Id.* at 9.) In the fifth, Ms. Sweat stated that she had her sister call Detective Solis and that her sister had told her that once he contacted the county attorney he could work on getting her out. (*Id.* at 11.) She asked Detective Solis to get her out and stated that she believed she could provide more help regarding Rita's case if she was out and that she would try her best to find out what happened. (*Id.*) In the sixth letter, Ms. Sweat asked Detective Solis to

respond to her for her children's sake, which was the reason she was working with him. (*Id.* at 14.) She also stated that Yolanda was going to court on June 10, 1991, and might be released, that he should talk to her right away, and that Patrick Fields was back in custody but that she could find out more if she was released because the trial was coming up. (*Id.* at 14–15.) In the final letter, Ms. Sweat wrote to Solis that "you told me if I helped you, you would help me ... I would just like to know if the agreement is still on." (*Id.* at 17.) She stated there was more than one way she was willing to help the county attorney. (*Id.*)

Petitioner developed additional evidence based on the letters and submitted it to the Court. First, Petitioner submitted a declaration from Yolanda McKaney, dated March 30, 1999. (*Id.*, ex. H.) Ms. McKaney declares that in early 1990, around the time of the death of Rita DeLaO, she was in Casa Grande in the area of the park near Trekle Road and Florence Boulevard. (*Id.*, ¶ 2.) While in that area, she observed Patrick Fields come into a nearby alley with blood all over his shirt. (*Id.*, ¶ 3.) He took off the shirt, threw it in a dumpster and burned it. (*Id.*, ¶ 4.) Further, she declared that Milton Barnett was in the area at the time. (*Id.*, ¶ 6.)

Second, Petitioner submitted a declaration from Milton Barnett, Jr., dated April 2, 1999. (*Id.*, ex. I.) Mr. Barnett declared that in January 1990, he was on his way home from the park by Second Street in Casa Grande just as the sun was coming up. (*Id.*, ¶ 1.) As he passed down an alley he saw Patrick Fields leaning over a dumpster and throwing in something that he had rolled up in his hand. (*Id.*, ¶ 2.) Patrick was bare-chested and upset. (*Id.*) He and Patrick left to go smoke. (*Id.*, ¶¶ 3–4.) When Patrick pulled a pipe out of his pocket, Barnett noticed blood on his pants and shoes. (*Id.*, ¶ 6.) Mr. Barnett

asked Patrick what he had done, and Patrick threw down the pipe and ran away. (*Id.*, ¶ 7.) The next day he heard that Petitioner's girlfriend had been killed. (*Id.*, ¶ 8.)

Petitioner filed an April 7, 1999 declaration from Patrick Fields stating that he was in Pinal County Jail at the time Rita DeLaO was killed. (*Id.*, ex. J.) Counsel represents that they have been unable to verify Mr. Field's assertion regarding his custody status.

### Expansion of the Record

Rule 7 of the Rules Governing Section 2254 Cases authorizes a federal habeas court to expand the record to include additional material relevant to the determination of the merits of a petitioner's claims. Rule 7 provides:

> The materials that may be required include letters predating the filing of the petition, documents, exhibits, and answers under oath, to written interrogatories propounded by the judge. Affidavits may also be submitted and considered as part of the record.

Rule 7(b), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. The purpose of Rule 7 "is to enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing." Advisory Committee Notes, Rule 7, 28 U.S.C. foll. § 2254; *see also Blackledge v. Allison,* 431 U.S. 63, 81–82, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977).

As an initial matter, at the time Petitioner lodged with the Court his proposed Third Amended Petition, he simultaneously lodged Exhibits to Third Amended Petition for Writ of Habeas Corpus. (*See* dkt. 7/16/2004.) After the Court granted amendment in part and ordered the filing of a third amended petition, Petitioner moved the Court to file the lodged exhibits. Respondents object to the filing of

certain exhibits, characterizing it as an attempt to expand the state court record. The filing of exhibits in this Court does not amount to an automatic expansion of the state court record; rather, it makes them a part of the record presented to this Court, from which Petitioner can and did seek expansion to allow consideration of the exhibits as to the merits of his claims. The Court will grant Petitioner's request to file the lodged exhibits in their entirety, and will consider whether expansion of the state court record is warranted as to each exhibit individually.

■ Petitioner requests expansion of the state court record as to Exhibits A through T. Respondents agree that Exhibits A to O were filed in state court, therefore, expansion of the record is not necessary as to these documents and the request will be denied. Exhibit P is a declaration of Laron Neal dated July 10, 2004, which Petitioner concedes was never presented in state court. Mr. Neal's declaration relates solely to the events surrounding the attempted murder of Norma Soto, which is not at issue in Claim 16. Because this document is not relevant to Claim 16, expansion pursuant to Rule 7 is not warranted and will be denied as to Exhibit P.

Exhibits Q through T are declarations from trial jurors regarding various issues. These exhibits were first presented to the Arizona Supreme Court as Exhibits A through D to a document entitled Supplement to Petition for Review or, Alternatively, Proffer Regarding Claims and Evidence Which Could have been Presented in a Full and Fair Postconviction Proceeding. (PR Doc. 20.) The jurors whose declarations are presented as Exhibits R, S and T attest that if they had heard evidence that someone else may have murdered Rita DeLaO it might have changed their verdict; Exhibit Q does not discuss the new evidence. (Third Am. Pet., exs. Q–T.)

■ The parties dispute whether the presentation of Exhibits Q through T to the Arizona Supreme Court is sufficient to make them part of the state court record for purposes of deciding the merits of Petitioner's claims before this Court. Regardless, the Court assesses whether expansion would be appropriate assuming they are not already part of the record. The legal standard governing Claim 16 requires the Court to determine whether there is a *reasonable* probability that the suppressed evidence would have changed the verdict. *See Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. Juror declarations are irrelevant to that standard, which is objective rather than subjective. Therefore, expansion is not warranted under Rule 7 because the exhibits are not relevant to a resolution of Claim 16 and the request will be denied as to Exhibits Q through T.

### Discovery

■ Rule 6(a) of the Rules Governing Section 2254 Cases ("Habeas Rules") provides that "[a] judge may, for *good cause,* authorize a party to conduct discovery under the Federal Rules of Civil Procedure, and may limit the extent of discovery." Rule 6(a), 28 U.S.C. foll. § 2254 (emphasis added). Whether a petitioner has established "good cause" for discovery requires a habeas court to determine the essential elements of the petitioner's substantive claim and evaluate whether "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief." *Bracy v. Gramley,* 520 U.S. 899, 908–09, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (quoting *Harris v. Nelson,* 394 U.S. 286, 300, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969)).

Petitioner contends that the information he requests will demonstrate the state possessed evidence that exculpated him of the crimes with which he was charged, the nature and extent of that evidence, and that the evidence was withheld from him. Respondents do not contest any particular discovery request, they argue only that discovery should be denied for lack of diligence. As discussed in the Evidentiary Hearing Section below, the Court finds that Petitioner was diligent in developing Claim 16 in state court.

Petitioner requests the following discovery in relation to Claim 16:

1. All documents in the possession of the Eloy Police, Casa Grande Police, Pinal County Sheriff and the Arizona Department of Public Safety relating to contact with, or investigation of, Patrick Fields, Aryon Williams, and any other suspect or party of interest regarding the murder of Rita DeLaO or attempted murder of Norma Soto. Included in this request are all jail, medical and mental health records.

2. If necessary, depositions of the custodian of records of the documents requested in number 1, and persons with knowledge regarding the contacts and/or investigations of the persons listed in number 1.

3. All documents in the possession of the Pinal County Attorney, Pinal County Drug Task Force and the Arizona Attorney General relating to the investigation of Patrick Fields, Aryon Williams, and any other suspect or party of interest regarding the murder of Rita DeLaO or attempted murder of Norma Soto.

4. Deposition of Detective Thomas Solis relating to his investigation of the murder of Rita DeLaO, including Patrick Fields and the information contained in the letters from Beverly Sweat.

■ Petitioner's document requests appear reasonably designed to ensure that he receives all potentially exculpatory material regarding the murder of Rita DeLaO, including any evidence that might have been developed from the information contained in the Sweat letters, which is directly related to the elements of his *Brady* claim. Therefore, the Court finds, within the parameters set forth below, good cause for requests 1 and 3 and they are granted. Because Claim 16 relates solely to Petitioner's conviction for murdering Rita DeLaO, there is no good cause for discovery related to the attempted murder of Norma Soto and such requests are denied. Petitioner's requests are authorized only as to the Pinal County Sheriff, the Arizona Department of Public Safety, the Pinal County Attorney and the Arizona Attorney General, as those were the agencies involved in the investigation and prosecution of that murder; the requests directed to the Eloy Police, Casa Grande Police and Pinal County Drug Task Force are denied. Petitioner's requests for jail, medical and mental health records are denied for failure to demonstrate good cause, with the exception of the state providing a record of whether Patrick Fields was in custody at the time of Rita DeLaO's murder.

Petitioner acknowledges that there is not currently good cause for depositions of the custodian of records because he framed his request as "if necessary." Because the Court finds no necessity for such depositions at this time, request 2 is denied without prejudice. Further, the Court finds that Petitioner has not demonstrated good cause for a deposition of Detective Tom Solis at this time. Based on a review of Respondents' answer and their initial disclosure of the Sweat letters, there appears to be no dispute that the state possessed the information contained in the letters prior to trial and did not disclose it to Petitioner. The answer to whether Petitioner is entitled to relief hinges on whether that evidence, or evidence devel-

oped therefrom, is material under the *Brady* standard. Petitioner has not demonstrated that deposing Detective Solis would help establish the materiality of the evidence beyond anything he may discover from the document disclosures. Therefore, request 4 is denied without prejudice.

### Evidentiary Hearing

The decision whether to grant an evidentiary hearing when there are material facts in dispute is generally at the discretion of the district court judge. *See Townsend v. Sain,* 372 U.S. 293, 312, 318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *overruled in part by Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), *and limited by* § 2254(e)(2); *Baja v. Ducharme,* 187 F.3d 1075, 1077 (9th Cir.1999); Rule 8, Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (providing that the district court judge shall determine if an evidentiary hearing is required). However, a judge's discretion is significantly circumscribed by § 2254(e)(2) of the AEDPA. *See Williams v. Taylor,* 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000).

Section 2254 provides that:

*If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—*

(A) the claim relies on—

   (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

   (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added).

As interpreted by the Supreme Court, subsection (e)(2) precludes an evidentiary hearing in federal court only if the failure to develop a claim's factual basis is due to a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams,* 529 U.S. at 432, 120 S.Ct. 1479. "The purpose of the fault component of 'failed' is to ensure the prisoner undertakes his own diligent search for evidence." *Id.* at 435, 120 S.Ct. 1479. The Court found that this rule served AEDPA's goal of furthering comity in that "federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Id.;* *see also Cardwell v. Netherland,* 971 F.Supp. 997, 1008 (E.D.Va.1997) ("Ordinarily, a § 2254 petition is limited to the factual record developed in state court proceedings"), *aff'd Cardwell v. Greene,* 152 F.3d 331 (4th Cir.1998), *overruled on other grounds, Bell v. Jarvis,* 236 F.3d 149 (4th Cir.2000). In correlation, subsection (e)(2) allows factual development when a petitioner diligently attempts to develop the factual basis of a claim in state court and is "thwarted, for example, by the conduct of another or by happenstance was denied the opportunity to do so." *Williams,* 529 U.S. at 432, 120 S.Ct. 1479; *see Baja,* 187 F.3d at 1078–79.

In compliance with § 2254(e)(2), when the factual basis for a particular claim has not been fully developed in state court, the first question for a district court in evaluating whether to grant an evidentiary hearing on the claim is whether the petitioner was diligent in attempting to develop its factual basis. *See Baja,* 187 F.3d at 1078 (quoting *Cardwell v. Greene,* 152 F.3d 331, 337 (4th Cir.1998), *overruled on other*

*grounds, Bell v. Jarvis,* 236 F.3d 149 (4th Cir.2000)). The Supreme Court set an objective standard for determining "diligence"—whether a petitioner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams,* 529 U.S. at 435, 120 S.Ct. 1479.

Absent unusual circumstances, diligence requires "that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams,* 529 U.S. at 437, 120 S.Ct. 1479; *see Bragg v. Galaza,* 242 F.3d 1082, 1090 (9th Cir.2001), *amended on denial of reh'g,* 253 F.3d 1150 (9th Cir.2001) ("inactions show insufficient diligence" on ineffective counsel claim because petitioner did not request an evidentiary hearing, and brought claim only on appeal not in a collateral proceeding). If an evidentiary hearing is requested, a petitioner's inability to persuade a state court to conduct such a hearing does not in itself demonstrate lack of diligence. *See Cardwell,* 152 F.3d at 338.

■ In sum, if this Court determines that a petitioner has not been diligent in establishing the factual basis for his claims in state court, then the Court may not conduct a hearing unless the petitioner satisfies one of § 2254(e)(2)'s narrow exceptions. If, however, the petitioner has not failed to develop the factual basis of his claim in state court, the Court will then proceed to consider whether a hearing is appropriate or required under the criteria set forth by the Supreme Court in *Townsend,* 372 U.S. 293, 83 S.Ct. 745; *see Baja,* 187 F.3d at 1078 (quoting *Cardwell,* 152 F.3d at 337). A federal district court *must* hold an evidentiary hearing in a § 2254 case when the facts are in dispute if (1) the petitioner "alleges facts which, if proved, would entitle him to relief," and (2) the state court has not "after a full hearing reliably found the relevant facts." *Town-*

*send,* 372 U.S. at 312–13, 83 S.Ct. 745. In any other case in which the facts are in dispute and diligence has been established, the district court judge "has the power, constrained only by his sound discretion, to receive evidence bearing upon the applicant's constitutional claim." *Id.* at 318, 83 S.Ct. 745 (noting that if a "habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings, [the judge] may, and ordinarily should, accept the facts as found in the hearing").

### Diligence

■ Respondents argue that Petitioner was not diligent in developing Claim 16 because he failed to include it in a timely PCR petition. The Court has determined that the state court's dismissal of the petition as untimely is not adequate to bar federal review, therefore, it cannot dictate a per se finding of lack of diligence. As required by *Williams,* the Court will review the efforts Petitioner made, under the circumstances, to develop the claim and present it in state court in his PCR proceeding. 529 U.S. at 435, 120 S.Ct. 1479.

In his PCR petition, Petitioner asked for a complete investigation into his case and an evidentiary hearing on all of the claims presented therein. (ROA–PCR 1/30/03 Pet. at 39–40.) Attached to the Petition were exhibits labeled A through O, which included the Sweat letters and the declarations from McKaney, Barnett and Fields. (*Id.,* exs. A, H–J.) Upon dismissal of the PCR petition, Petitioner filed a motion for rehearing asking that the dismissal be vacated and that he be allowed to amend the petition after further investigation. (ROA–PCR 3/4/03 Mot.)

Petitioner satisfied the minimum standard for diligence by requesting a hearing in state court, *see Williams,* 529 U.S. at 437, 120 S.Ct. 1479, and he requested in-

vestigation and attached documents in support of the claim to his PCR petition. Therefore, the Court finds that Petitioner was diligent in his efforts to develop Claim 16 in state court and this Court is not barred from conducting an evidentiary hearing under § 2254(e)(2).

### Request for a Hearing

Petitioner requests an evidentiary hearing to the extent the Court finds disputed issues of fact regarding Claim 16. Respondents contend the Court should not hold a hearing because Petitioner has not set forth a colorable constitutional claim.

The main evidence against Petitioner at trial regarding the murder of Rita DeLaO was the testimony of Michelle Deloney. Michelle initially provided an alibi for Petitioner, doing so, according to her own testimony, before Petitioner told her to do so or threatened her if she failed to do so. (RT 5/15/92 at 171–73; RT 5/20/92 at 23.) Michelle did not provide any inculpatory information regarding Petitioner's involvement in Rita DeLaO's murder until cash and Petitioner's gun were found in her car in relation to the attempted murder of Norma Soto. The detective who conducted Michelle's interview after Petitioner's arrest concedes he put her under significant pressure during that interview and Michelle was scared she was going to be separated from her child. (RT 6/10/92 at 126.) Michelle provided Petitioner her contact information while he was in jail and continued to speak to him on the phone, despite expressing to the police that she feared him. (RT 5/21/92 at 29–30, 41–42.)

The physical evidence linking Petitioner to the crime was limited. The bullets were consistent with the caliber of Rita's gun which was in Petitioner's possession at some point that night. His fingerprints were found on the outside of the car, however, it is undisputed that he spent time with Rita in the days before her murder.

The testimony by Rita's family about Petitioner's threats regarding custody of his son was refuted by all members of Petitioner's family.

The primary evidence Petitioner presented at trial to refute the prosecution's case was his own testimony. The prosecutor emphasized in his closing argument that the evidence pointed to no one but Petitioner. (RT 6/22/92 at 90.) The suppressed evidence of another suspect is potentially weighty in light of the circumstantial case against Petitioner.

The Court does not question that the trial evidence was sufficient to support the verdict, or that taking the suppressed evidence into consideration the evidence as a whole would not support the conviction. However, that is not the standard. The Court must assess whether Petitioner's trial was fair and whether the Court can have confidence in the conviction when the suppressed evidence is taken into account. At a minimum, Petitioner has presented a colorable *Brady* claim and has never had the opportunity to fully develop it.

Under *Townsend* and Rule 8, this Court has discretion to grant an evidentiary hearing when there are material facts in dispute and the Court has found that Petitioner was diligent. 372 U.S. at 312, 318, 83 S.Ct. 745. In this case, the Court concludes there are material facts in dispute and material facts were not adequately developed in a state-court hearing. Therefore, the Court will grant Petitioner an evidentiary hearing as to Claim 16. In light of the narrow focus of Claim 16 the Court finds it appropriate to expand the record through the receipt of written evidence rather than to conduct an in-court hearing. *See Williams v. Woodford*, 384 F.3d 567, 590–91 (9th Cir.2004) (finding that a district court may expand the record and receive written evidence rather than conduct a full in-court hearing); 28 U.S.C.

§ 2246 ("On application for a writ of habeas corpus, evidence may be taken orally or by deposition, or in the discretion of the judge, by affidavit."); Rule 7, Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (providing for expansion of the record), and Rule 7 Advisory Comm. Note. This is particularly appropriate under the circumstances of this case because Petitioner's motion does not identify specific evidence to be developed at an evidentiary hearing, or indicate why particular evidence requires oral presentation.[6]

As addressed above, the Court is granting limited discovery requested by Petitioner and he may file any materials discovered through that process with the Court. Additionally, the State is required to file with the Court documentation regarding whether Patrick Fields was in custody at the time of Rita DeLaO's murder, and may file additional evidence at its discretion.

Accordingly,

**IT IS ORDERED** that Petitioner's Motion to Order Filing of Lodged Exhibits to Third Amended Petition for Writ of Habeas Corpus (dkt. 84) is **GRANTED**, and the Clerk shall **FILE** the Exhibits to Third Amended Petition for Writ of Habeas Corpus lodged with the Court on July 16, 2004.

**IT IS FURTHER ORDERED** that Petitioner's Motion for Discovery, Expansion of the Record and Evidentiary Hearing on Claim 16 (dkt. 96) is **GRANTED IN PART** as to discovery and an evidentiary hearing, and **DENIED IN PART**, as to discovery and expansion of the record, as set forth in the body of the Order.

**IT IS FURTHER ORDERED** that Respondents shall respond to Petitioner's

document requests within thirty (30) days of the date of this Order.

**IT IS FURTHER ORDERED** that Petitioner and Respondents shall submit to the Court and exchange written evidence on Claim 16 within sixty (60) days of the filing of this Order.

**IT IS FURTHER ORDERED** that if, pursuant to LRCiv 7.2(g), Petitioner or Respondents file a Motion for Reconsideration of this Order, such motion shall be filed within fifteen (15) days of the filing of this Order.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007–3329.

---

[6]. After the submission of written evidence, the Court will sua sponte re-evaluate its decision regarding whether an in-court hearing or additional briefing is necessary to resolve the claim.