**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD KENNETH DJERF,
*Petitioner-Appellant*,

v.

CHARLES L. RYAN,
*Respondent-Appellee.*

No. 08-99027

D.C. No.
2:02-cv-00358-JAT

OPINION

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued and Submitted March 26, 2019
San Francisco, California

Filed July 24, 2019

Before:  M. Margaret McKeown, Ronald M. Gould,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's dismissal of an Arizona state prisoner's 28 U.S.C. § 2254 habeas corpus petition challenging his conviction by guilty plea for four counts of first-degree murder and his capital sentence.

Following a period of appointed representation, petitioner waived counsel and represented himself. He entered guilty pleas, and counsel resumed representation for sentencing.

The panel held that counsel did not provide constitutionally ineffective pre-trial assistance by failing adequately to communicate with petitioner or visit him in jail, or to diligently interview witnesses, review discovery, and examine evidence. The panel concluded that, under any standard of review, counsel's conduct was not objectively unreasonable. Accordingly, petitioner's claims of involuntary waiver of counsel and invalid guilty pleas, premised on ineffective pre-trial assistance, failed. Further, petitioner's procedural default of the ineffective assistance claims was not excused.

The panel affirmed the district court's denial of petitioner's claim that counsel provided ineffective assistance during sentencing by failing to investigate, develop, and present additional mitigation evidence related

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to his family background and mental health. The panel concluded that the state post-conviction court did not unreasonably apply Supreme Court precedent in holding that there was no ineffective assistance of counsel during sentencing, and the district court did not abuse its discretion in denying petitioner's request for an evidentiary hearing on that claim.

Finally, any error in the Arizona court's impermissibly ignoring mitigating evidence of petitioner's family background because it lacked a causal nexus to his crimes was harmless.

## COUNSEL

Therese Michelle Day (argued) and Michael L. Burke, Assistant Federal Public Defenders; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Petitioner-Appellant.

Ginger Jarvis (argued), Assistant Attorney General; Lacey Stover Gard, Chief Counsel; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Respondent-Appellee.

## OPINION

McKEOWN, Circuit Judge:

Richard K. Djerf killed the mother, father, brother, and sister of a former friend to avenge a petty theft. He was promptly arrested and charged with numerous crimes. After a year and a half of appointed representation, he waived counsel and represented himself. Djerf pleaded guilty to four counts of first-degree murder, and counsel resumed representation for sentencing. The trial judge imposed a capital sentence for each of the murder convictions. The Arizona Supreme Court did the same on de novo review. Arizona courts denied Djerf's requests for post-conviction relief, and the district court dismissed his federal habeas petition. We affirm.

## FACTUAL BACKGROUND[1]

Djerf and Albert Luna, Jr. were friends from their job at the local supermarket, but in early 1993 Albert stole several electronics and a firearm from Djerf's apartment. Djerf reported the incident and his suspicions about Albert's involvement to the police, who took no action. Djerf sought revenge several months later. Late one morning, Djerf arrived at the Luna family home with a handgun, knife, latex gloves, handcuffs, and fuse cord, using a vase with fake flowers as a ruse to gain entry. Albert's mother and five-year-old brother were home; Djerf bound them and asked the mother whether she or her young son should die first and whether she knew Albert's whereabouts. Djerf briefly

---

[1] The following account of Djerf's crimes was set forth by the Arizona Supreme Court on direct review. *See State v. Djerf*, 959 P.2d 1274, 1279–80 (Ariz. 1998) (en banc).

untied the mother, forcing her to load electronics and other valuables from the home into the family car.

Several hours later, Albert's eighteen-year-old sister came home. Djerf bound and gagged her, cut off her clothes, and raped her before repeatedly stabbing her in the chest and head and slitting her throat. Djerf then told Albert's mother what he had done to her daughter.

Shortly after, Albert's father came home. Djerf handcuffed him and forced him to crawl on all fours and lay face down on his bed. Djerf struck him in the head several times with a baseball bat, removed his handcuffs, bound his hands with tape, and left him for dead. Djerf told the mother that he had killed her husband.

Djerf then attempted, but failed, to snap the boy's neck and to electrocute him with a stripped electrical wire. The father, who had survived the earlier beating, charged and stabbed Djerf with a pocketknife. During the ensuing struggle, Djerf stabbed the father and then fatally shot him six times in front of the mother and boy. Djerf asked the mother whether she wanted to watch the boy die, or for him to watch her die, before shooting both in the head. He covered the bodies and the house with gasoline, turned on two stove burners, and placed cardboard and a rag on the stove, before fleeing the house in the family's car. The cardboard and rag never ignited. When Albert returned to the house, he discovered the gruesome scene and notified the police.

Over the next several days, Djerf described the murders to his girlfriend and two other friends. Djerf was arrested shortly after.

## PROCEDURAL BACKGROUND

A grand jury charged Djerf with four counts of first-degree murder, as well as first-degree burglary, kidnapping, sexual assault, aggravated assault, attempted arson, theft, and unlawful use of a prohibited weapon. Michael Vaughn and Alan Simpson were appointed as counsel, and they represented Djerf at numerous hearings over the next year and a half. In February 1995, Djerf wrote to the trial judge to express his displeasure with the frequency of counsel's communication, their responsiveness, and their efforts to keep him apprised of trial strategy. Djerf requested that Vaughn and Simpson be withdrawn as counsel and asked to represent himself.

At a hearing several days later, the judge questioned Djerf at length to ensure he understood the disadvantages of self-representation and the severity of the potential penalties he faced. Counsel expressed their belief that Djerf was competent, but strongly advised against self-representation. The judge reiterated this advice, but nonetheless concluded Djerf knowingly, intelligently, and voluntarily waived his right to counsel, accepted the waiver of counsel, and appointed Vaughn and Simpson in an advisory capacity.

A few weeks later, the State requested an evaluation of Djerf's competence. In a prescreening report, Dr. Jack Potts concluded that Djerf understood the nature of the charges and possible penalties, the pending proceedings, his constitutional rights, and the necessary waiver of those rights if he entered a guilty plea. According to the report, Djerf understood he faced a "far greater burden" if he represented himself, but believed he had "very little to lose" given that the case against him was so strong. The report concluded that Djerf was competent to represent himself and that

further evaluation of his competency was unnecessary. The trial judge agreed.

Several months later, Djerf sent a letter to the prosecutor offering to accept the maximum non-capital sentences on all charges in exchange for an agreement not to pursue the death penalty, though he admitted he had little negotiating leverage. The prosecutor declined, affirming the State's intention to pursue death sentences on the murder charges. The prosecutor offered to dismiss all other charges if Djerf would plead guilty to the murder charges "with no agreements as to sentence." Djerf consulted with Vaughn and decided to accept the offer. During the change of plea hearing, the judge conducted a thorough canvass and accepted Djerf's guilty pleas.

Several weeks later, in September 1995, Djerf asked to remove Vaughn and Simpson as advisory counsel in light of their purported lack of attention and failure to communicate, and to appoint "effective" and "experienced" counsel for sentencing. Djerf stated that he "would prefer that counsel represent me for sentencing, but . . . I have pretty much lost trust in Mr. Vaughn and Mr. Simpson." The trial judge denied the motion, noting the substantial work counsel had performed on Djerf's case and their considerable experience in serious criminal cases. The judge concluded that "appoint[ing] some new attorney now at this stage would . . . not be in the interest of justice" because it would cause further delay and Djerf might have the same complaints about different lawyers.

Djerf ultimately withdrew his waiver of counsel, and the court reappointed Vaughn and Simpson. The State presented its aggravation case over the course of five days in October 1995.

After obtaining several continuances, Simpson presented Djerf's mitigation case in February 1996.**²** A jail guard testified to Djerf's conduct in detention, referencing several minor disciplinary infractions but indicating he was not an especially problematic inmate. Arthur Hanratty, a court-appointed investigator, testified about Djerf's upbringing, based on interviews with Djerf's parents and sister and a review of background records, school documents, and other materials. Counsel also introduced a recorded interview with Djerf corroborating much of Hanratty's testimony. The court then granted continuances for counsel's ongoing development of potential mental health expert evidence. Counsel ultimately opted not to present any such evidence.

In late spring 1996, counsel filed a presentence memorandum, and the mitigation hearing resumed, with another jail guard testifying to Djerf's respectful behavior and duties as a jail trustee serving meals. At the final sentencing hearing several weeks later, Djerf declined multiple offers to address the court before a sentence was rendered. The judge concluded that the State had proven three statutory aggravating factors for each murder and a fourth for the murder of the five-year-old boy. *See* Ariz. Rev. Stat. § 13-703(F)(5), (6), (8), (9) (1996). According to the judge, Djerf failed to prove any statutory or non-statutory mitigating factors: he "failed to show his difficult family background is a mitigating circumstance" because "[t]here is no evidence that any alleged difficult family background had any effect on the defendant's behavior during these killings that was beyond the defendant's control." The judge

---

**²** Vaughn was unable to attend the hearing because he "had to attend to matters in another court."

entered capital sentences for each of the four murder convictions.

In May 1998, the Arizona Supreme Court affirmed the convictions and, on de novo review, imposed the same capital sentences. *Djerf*, 959 P.2d at 1281–90. The court decided that Djerf's pre-trial waiver of counsel was valid and that the trial judge did not abuse his discretion by declining to conduct a competency hearing. *Id.* at 1281–84. The court also concluded that three aggravating factors had been proven for all four of the murders, a fourth aggravating factor applied to the murder of the boy, and Djerf failed to prove any mitigating factors. *Id.* at 1286–90. According to the Arizona Supreme Court, Djerf's difficult family background was not mitigating because such evidence "is not relevant unless the defendant can establish that his family experience is linked to his criminal behavior." *Id.* at 1289 (citing *State v. Ross*, 886 P.2d 1354, 1363 (Ariz. 1994)). The U.S. Supreme Court denied Djerf's petition for writ of certiorari. *Djerf v. Arizona*, 525 U.S. 1024 (1998) (mem.).

In February 2000, the Arizona Supreme Court appointed Jamie McAlister as counsel for Djerf's state post-conviction proceedings. A year and a half later, a different trial judge dismissed Djerf's petition for post-conviction relief. In early 2002, the Arizona Supreme Court summarily denied a petition for review.

Djerf then filed a federal habeas petition in district court. *See* 28 U.S.C. § 2254. In September 2004, Djerf requested discovery and an evidentiary hearing. A year later, the district court denied Djerf's request and dismissed several claims as either procedurally barred or non-cognizable. In September 2008, the district court denied the remaining claims, but granted a certificate of appealability for two of

them: (i) whether Djerf's pre-trial waiver of counsel was involuntary because he was forced to decide between self-representation and incompetent counsel, and (ii) whether Simpson and Vaughn provided ineffective assistance of counsel during sentencing by failing to investigate and present further mitigation evidence related to Djerf's family background and mental health. Djerf appealed.

In March 2009, Djerf filed another petition for post-conviction relief in state court claiming his guilty pleas were not knowing, intelligent, or voluntary and that McAlister provided ineffective assistance during the initial post-conviction proceedings. The state court rejected the first claim as precluded because it was denied by the Arizona Supreme Court on direct appeal. The court then dismissed the second claim on the grounds that Djerf did not have a constitutional right to counsel in post-conviction proceedings. A few months later, the Arizona Supreme Court summarily dismissed the petition.

In 2012, the U.S. Supreme Court decided *Martinez v. Ryan*, which held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. 1, 9 (2012). We granted Djerf's motion for a partial remand to permit him to pursue several claims, including whether McAlister's allegedly inadequate representation excused Djerf's failure to exhaust certain claims in the initial state post-conviction proceedings.

In April 2017, the district court denied all remaining claims, holding that Djerf did not establish cause and prejudice to set aside the procedural default of his pre-trial ineffective assistance claim. On appeal to this court, Djerf argued that the Arizona courts impermissibly ignored his family background mitigation evidence by employing an

unconstitutional "causal nexus" test.  *See generally Eddings v. Oklahoma*, 455 U.S. 104 (1982).  We expanded the certificate of appealability to include the causal nexus claim and the claims denied by the district court on partial remand.

## JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction under 28 U.S.C. §§ 1291 and 2253(a).  We review de novo the district court's denial of a writ of habeas corpus and for clear error its findings of fact. *Stanley v. Schriro*, 598 F.3d 612, 617 (9th Cir. 2010).  Because Djerf's federal habeas petition was filed after April 24, 1996, he must satisfy the standards set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA").  Under AEDPA, we may not grant relief unless a state court's ruling "was contrary to . . . clearly established Federal law[] as determined by the Supreme Court," "involved an unreasonable application of" such law, or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  In conducting this review, we look to the last reasoned state court decision for each claim. *White v. Ryan*, 895 F.3d 641, 665 (9th Cir. 2018).

## ANALYSIS

Djerf contends that Simpson and Vaughn provided ineffective assistance during their pre-trial representation. He acknowledges that he failed to raise, and therefore procedurally defaulted, this claim in the initial state post-conviction proceedings.  However, he argues that *Martinez* excuses the procedural default, because McAlister's ineffective assistance during post-conviction proceedings was the reason he failed to raise the claim.  Djerf advances two other claims premised on Simpson and Vaughn's purportedly deficient pre-trial representation: his waiver of

counsel was involuntary because he was forced to decide between ineffective counsel and self-representation, and his guilty pleas were invalid because the trial judge failed to disclose that he was forfeiting his right to proceed with competent counsel.  Because the record does not establish that Simpson and Vaughn's pre-trial representation was constitutionally deficient, the procedural default is not excused, and the waiver of counsel and guilty pleas claims fail.

Djerf advances two other claims on appeal.  He contends that Simpson and Vaughn provided ineffective assistance during sentencing by failing to investigate and present further evidence of his difficult family background and mental health issues.  Affording the necessary deference to the state court's denial of this claim under AEDPA, we affirm.  Finally, Djerf contends that the Arizona courts impermissibly ignored mitigating evidence of his family background because it lacked a causal nexus to his crimes. We conclude any such error was harmless.

## I. Claims Premised on Ineffective Pre-Trial Representation

As noted, several of Djerf's claims are premised on ineffective pre-trial assistance by Vaughn and Simpson. Specifically, Djerf contends that they failed to adequately communicate with or visit him in jail, or to diligently interview witnesses, review discovery, and examine evidence.  The record belies these complaints.  Jail visitor logs and Djerf's own correspondence demonstrate that counsel visited him in the months preceding his request for self-representation and communicated with him regularly over the telephone and at court.  The record likewise establishes that counsel performed significant work during this time: they interviewed more than fifty witnesses, with

some interviews lasting several days; they initiated negotiations for a plea deal; they filed various motions on Djerf's behalf and attended regular hearings; they prepared for parallel, consolidated proceedings involving use and treatment of DNA evidence; and they spent nearly an entire day reviewing the physical evidence in police custody. During his waiver of counsel hearing, and again in a hearing at the onset of sentencing proceedings, Djerf acknowledged that Vaughn and Simpson had done considerable work on his behalf during their months of representation. The record demonstrates that brief continuances sought by counsel were reasonably necessary to permit the continued preparation for trial and accommodate health issues and other case responsibilities, not, as Djerf asserts, because counsel had failed to start any serious work on his case.

We see no indication that Simpson and Vaughn's "representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). They satisfied their "duty to make reasonable investigations" by interviewing dozens of witnesses and seeking out and reviewing evidence. *Id.* at 691. The record rebuts Djerf's conclusory allegations that counsel "did nothing at all to prepare a defense." *Crandell v. Bunnell*, 25 F.3d 754, 755 (9th Cir. 1994) (per curiam). At no point was there a "complete breakdown in communication," *Daniels v. Woodford*, 428 F.3d 1181, 1201 (9th Cir. 2005), nor did counsel ever fail to "consult with the defendant on important decisions [or] to keep the defendant informed of important developments in the course of the prosecution." *Strickland*, 466 U.S. at 688. Again, despite Djerf's suggestions to the contrary, the record does not reveal any significant periods of time during which counsel failed to communicate with or respond to him. *See Crandell*, 25 F.3d at 755 (suggesting that complete silence for the first two

months of representation raised questions about competence of counsel). Under any standard of review, Simpson and Vaughn's conduct was not objectively unreasonable.

Because the record fails to establish that Vaughn and Simpson provided constitutionally inadequate pre-trial assistance, it also fails to establish that Djerf was forced to choose between self-representation and incompetent counsel. As a result, his claim that his waiver of counsel was involuntary fails. So does his related argument that the trial judge erred by failing to further investigate his motivation for removing counsel and therefore discover the purportedly ineffective representation.[3] Djerf's challenge to the validity of his guilty pleas also fails—the record does not establish that counsel were incompetent, so Djerf did not forfeit any right to proceed with competent counsel. No clearly established Supreme Court precedent entitles Djerf to relief on his waiver of counsel and guilty plea claims, and the Arizona courts reasonably applied the facts in the record to deny them.

For the same reasons, we conclude that the procedural default of the underlying ineffective assistance claim is not excused. To excuse a procedural default, a habeas petitioner must establish both "cause" and "prejudice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Typically, ineffective

---

[3] Djerf also argues that his waiver of counsel and request for self-representation in February 1995 should have been construed as a request to substitute counsel and that the trial court erred by failing to do so. This argument is not consistent with the record; Djerf several times expressly stated his desire to represent himself, despite strong discouragement from the judge and counsel. At no point prior to or during the February 1995 hearing did Djerf intimate a desire for other counsel. In view of this record, the Arizona Supreme Court's denial of this claim was not an unreasonable application of Supreme Court precedent. *See Djerf*, 959 P.2d at 1283–84.

assistance of post-conviction counsel cannot excuse a procedural default. *See Martinez*, 566 U.S. at 9, 13–14. However, *Martinez* created a narrow exception in Arizona and other states that bar ineffective assistance claims on direct appeal; in those states, the initial collateral proceedings are the first opportunity to bring such claims. *Id.* The Supreme Court subsequently expanded this exception, holding that where a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, our holding in *Martinez* applies." *Trevino v. Thaler*, 569 U.S. 413, 429 (2013). To satisfy "cause" in this context, Djerf must show that McAlister was ineffective under *Strickland*—that is, McAlister's post-conviction representation was deficient because she failed to bring the pre-trial ineffective assistance claim, and there is a "reasonable probability" that, had the claim been raised, "the result of the post-conviction proceedings would have been different." *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 819 (9th Cir. 2015) (en banc). To satisfy "prejudice," Djerf must show that the underlying claim is "substantial"—that is, that it has "some merit." *Id.* There is considerable overlap between these requirements, since each considers the strength and validity of the underlying ineffective assistance claim. *See id.*

Even if we were to assume that Djerf's pre-trial ineffective assistance claim was substantial (which would be a stretch in light of the record and the service performed by counsel), there is no reasonable probability that advancing that claim during initial post-conviction proceedings would have altered the result. *See Rodney v. Filson*, 916 F.3d 1254,

1260 (9th Cir. 2019) (clarifying that a petitioner represented by counsel in post-conviction proceedings must satisfy both *Strickland* prongs). Djerf's post-hoc criticisms of counsel's pace of preparation were contradicted by his statements at the time, as well as those of the prosecutor and trial judge. The record shows regular visits and communication between counsel and Djerf, and Djerf has not identified any authority, existing then or now, suggesting that the frequency and nature of communication was constitutionally infirm. Even if Djerf had been able to show that the representation was constitutionally deficient, he would have struggled to show that the purported deficiencies resulted in sufficient prejudice to warrant overturning his four murder convictions. We cannot excuse the procedural default of this claim under these circumstances.

## II. Ineffective Representation During Sentencing

We next turn to Djerf's claim that Simpson and Vaughn rendered ineffective assistance during sentencing by failing to further investigate, develop, and present additional mitigation evidence related to his family background and mental health. The trial judge's post-conviction denial of this claim was the last reasoned state court decision, so we review that ruling under AEDPA. *See Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). In the district court, Djerf requested an evidentiary hearing in connection with this claim. As explained below, the state post-conviction court did not unreasonably apply Supreme Court precedent in holding there was no ineffective assistance of counsel during sentencing and the district court did not err in denying Djerf's request to expand the record.

## A.  Family Background

Djerf's argument that counsel provided ineffective assistance by failing to obtain more background records and conduct more interviews was rejected by the post-conviction judge because Djerf failed to present any supporting evidence, and instead merely "speculate[d] that if his childhood was investigated, some mitigating evidence might have been discovered." We review the post-conviction judge's determination under AEDPA and determine it was not an unreasonable application of Supreme Court precedent.

Throughout the entirety of his state post-conviction and federal habeas proceedings, Djerf has failed to identify any evidence related to his childhood that counsel should have, but did not, uncover. Crucially, Djerf did not point the post-conviction judge to any evidence sentencing counsel failed to present that was meaningfully different from what was introduced at mitigation. It was Djerf's burden to establish a reasonable probability that the result of the proceedings would have been different but for counsel's purported errors. *Strickland*, 466 U.S. at 694. *Strickland* prejudice is not established by mere speculation that witness testimony "might have given information helpful to" the defense. *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001). Under the significant deference required by AEDPA, the post-conviction judge's denial of this claim was neither an unreasonable application of clearly established law nor an unreasonable determination of the facts in light of the evidence in the record at that time.

## B.  Mental Health

Djerf's argument that counsel provided ineffective assistance by failing to investigate and develop additional

mental health mitigating evidence was rejected by the post-conviction judge for a similar reason: Djerf merely relied on expert reports prepared prior to sentencing to speculate that "there might be other mitigating information that should have been presented." Under AEDPA, the state court's ruling that Djerf did not suffer ineffective assistance of counsel due to the alleged failure to develop additional mental health mitigating evidence was not an unreasonable application of Supreme Court precedent.

In his initial post-conviction proceedings, Djerf's appointed mental health expert conducted extensive neurological testing. However, Djerf did not introduce any reports or other evidence from this expert in support of his petition. Instead, he submitted Dr. Potts's prescreening report from April 1995 and reports prepared by Dr. McMahon, Dr. Walter, and Dr. Duane prior to sentencing.

In the winter of 1995–96, Dr. McMahon conducted several hours of psychological testing and prepared a report, noting that Djerf's results were suggestive of "learning disabilities and/or some diffuse neuropsychological dysfunction." He recommended further evaluation. Dr. Walter then completed neuropsychological testing; he reported that Djerf performed "relatively well in [a] number of areas," though there were indications that he might have a "focal cerebral deficit in the right temporal area." To better understand the possible "right temporal disturbance," Dr. Walter recommended further neuropsychiatric evaluation to seek out possible "abnormal electrical activity." Dr. Duane then conducted an electro-encephalogram and advanced brain-mapping. Dr. Duane summarized Djerf's developmental history, noting that as an infant, Djerf "fell over and hit his head with a large knot" and reportedly fell often in the subsequent years. Dr. Duane concluded that the

test results were consistent with a personality disorder, not brain dysfunction.  Dr. McMahon compiled the results of all these findings and conclusions into a final report.  Dr. McMahon intimated that the test results are consistent with an antisocial personality disorder, not a delusional disorder or schizophrenia.  Dr. McMahon acknowledged that Djerf likely has "some learning disabilities that . . . affect his ability to organize a situation and make effective decisions," but concluded "there is an absence of a sufficiently severe mental defect that it would have precluded his appreciating the wrongfulness of his acts, or resulted in an inability to conform his behavior to the requirement of the law."  Counsel received each report, and, several days after receiving Dr. McMahon's final report, notified the court they would not be submitting any expert mental health evidence in mitigation.

The post-conviction judge considered and rejected Djerf's argument that sentencing counsel provided ineffective assistance because they failed to adequately investigate and develop evidence of "a serious brain-related injury" that Djerf experienced as a child.[4]  At least two of

---

[4] Djerf argues that AEDPA deference does not apply here because the post-conviction judge made a factual error.  Indeed, the judge incorrectly stated that the reports prepared by Dr. McMahon, Dr. Walter, and Dr. Duane had been "considered by the court prior to sentencing."  Counsel did not submit the reports to the court.  However, this minor error does not unlock de novo review.  *See* 28 U.S.C. § 2254(d).  The judge rejected this claim because Djerf failed to show there was helpful mental evidence that sentencing counsel could have, but failed to, develop.  Djerf's speculation that such evidence *might* have existed was insufficient.  Whether the sentencing court reviewed certain reports prior to sentencing had no bearing on this holding.  De novo review is authorized when a "decision . . . *was based* on an unreasonable determination of the facts," not every time an order or opinion includes an incorrect factual finding.  28 U.S.C. § 2254(d) (emphasis added).

the experts who evaluated Djerf prior to sentencing were aware of his alleged childhood head injury. Djerf does not specify what further information counsel should have but failed to uncover and provide to the experts to assist in their evaluations: Djerf's mother admitted she did not seek medical attention for her son, and no other family member recalled the injury or any side effects. The McMahon, Walter, and Duane reports could reasonably be read to rule out schizophrenia or any other comparably mitigating disorder. Djerf asked the post-conviction judge to deduce from these reports that unidentified background evidence would have changed the diagnosis or that other experts, equipped with such information, might have diagnosed him with schizophrenia. It was not unreasonable for the judge to decline the invitation to make this speculative leap. That Djerf later found experts who might nominally disagree with the earlier findings, *see infra* p.23–24, does not render the state court's ruling unreasonable, as no evidence establishing a diagnosis helpful to the defense was in the state post-conviction record. *See Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014) (AEPDA review limited to evidence in state court record). Any argument that sentencing counsel erred by failing to present reports or testimony from Dr. McMahon, Dr. Walter, or Dr. Duane during mitigation is equally unavailing. "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that [they] did so for tactical reasons . . . ." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam). Given that many aspects of their reports were harmful to Djerf's mitigation case, that presumption remains unrebutted here. For all of these reasons, we hold that the post-conviction judge

reasonably applied *Strickland* in concluding that sentencing counsel did not provide ineffective assistance.[5]

We need not reach the second prong of *Strickland*, but if we did, we would conclude that the sentencing counsel's failure to investigate, develop, and present additional mental health evidence was not prejudicial. Again, it is not clear what evidence counsel would have uncovered had they more vigorously investigated the purported head injury, or that the discovery of such evidence would have resulted in expert evidence supporting a schizophrenia diagnosis. Such speculation rarely creates a "reasonable probability" that a different result would have occurred absent the purportedly deficient representation. *Strickland*, 466 U.S. at 694. The prejudice inquiry also requires consideration of the State's aggravation case, which was remarkably strong: at least three aggravating factors applied for each victim, including undisputed, vivid details of gruesome physical, sexual, and emotional abuse preceding the killings. The post-conviction judge reasonably concluded that any deficient performance by sentencing counsel was harmless under *Strickland*.

---

[5] Djerf claims that the post-conviction judge never reached the question of deficient performance and instead ruled only on prejudice. Accordingly, he insists we review *Strickland* performance de novo. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam). We disagree; read fairly, the judge's ruling addresses both prongs of the analysis. But even if we agreed with Djerf's take on the ruling, we would reach the same ultimate conclusion under de novo review. Counsel conducted a "thorough investigation of law and facts relevant to [Djerf's] plausible options" for mitigation, and we must therefore afford significant deference to their tactical decisions. *Hernandez v. Chappell*, 923 F.3d 544, 550 (9th Cir. 2019) (quoting *Strickland*, 466 U.S. at 690). Their investigation of possible mental health mitigation evidence was not unreasonable under prevailing professional norms. *Strickland*, 466 U.S. at 688.

## C.  Evidentiary Hearing

In the district court, Djerf requested an evidentiary hearing in connection with his ineffective assistance of sentencing counsel claim, and he now seeks a remand to permit expansion of the record and reconsideration of this claim.  The district court denied the request because Djerf had not been diligent in developing the proffered factual basis in state court.  For the following reasons, we affirm.

Under *Cullen v. Pinholster*, when a claim is subject to AEDPA review, a district court is limited to the record that was before the state court that adjudicated the claim on the merits.  563 U.S. 170, 185 (2011).  The entirety of the ineffective sentencing counsel claim is subject to AEDPA deference, so no evidentiary expansion is permitted.  Even if we granted a remand, *Pinholster* would prohibit the introduction of new evidence.

However, *Pinholster* was issued several years after Djerf requested and the district court denied an evidentiary hearing.  Lacking *Pinholster*'s guidance, the district court considered whether Djerf satisfied the exception for evidentiary expansion under 28 U.S.C. § 2254(e)(2)(A)(ii), which requires that "a factual predicate that could not have been previously discovered through the exercise of due diligence."  *See Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc) (expansion of the record is "severely restrict[ed]" when lack of diligence prevented factual development in post-conviction proceedings).  *Pinholster* clarified that this statutory exception applies only to claims reviewed de novo; evidentiary expansion is prohibited for a claim subject to AEDPA review, regardless of diligence. 563 U.S. at 185–86.

Even if we assume, as the district court did, that Djerf's claim was covered by § 2254(e)(A)(2)—because we reviewed the ineffective assistance of sentencing counsel claim de novo—we conclude that the district court did not abuse its discretion by declining to expand the record. *See West v. Ryan*, 608 F.3d 477, 484 (9th Cir. 2010) (reviewing decision to expand record for abuse of discretion).

As a threshold matter, Djerf's request for an evidentiary hearing in the initial post-conviction proceedings was not sufficient to demonstrate diligence. *Cf. Baja v. Ducharme*, 187 F.3d 1075, 1078–79 (9th Cir. 1999); *see also Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) ("Mere requests for evidentiary hearings will not suffice; the petitioner must be diligent in pursuing the factual development of his claim."). Moreover, Djerf fails to identify any new evidence that he presented to the state court in support of that request or any proffer he made to demonstrate why an evidentiary hearing at that time would have been worthwhile.

In the district court, Djerf sought a hearing to present testimony from his sister, his mother, Simpson, and Hanratty. A short declaration from his sister offered a few new, minor details about Djerf's upbringing—e.g., their father spanked him as a child—but otherwise only corroborated the family background evidence originally presented in mitigation. Djerf fails to explain how the testimony from the other witnesses would vary meaningfully from the family background evidence presented in mitigation, or why such evidence could not have been procured through the exercise of diligence during the initial post-conviction proceedings.

Djerf also seeks to present testimony from new medical experts who will testify in support of his theory that he

suffered from schizophrenia at the time of his crimes. Djerf and post-conviction counsel knew that brain dysfunction and schizophrenia had been investigated by sentencing counsel and several experts. Yet, despite having an appointed expert in the post-conviction proceedings, Djerf did not present any new medical, psychological, or neurological evidence at that time. Djerf fails to explain why the factual basis for this claim would have evaded discovery if he and his post-conviction counsel had been diligent. In sum, Djerf did little to show that an evidentiary hearing was warranted as to his family background or mental health, and the district court did not abuse its discretion by refusing to hold one.

## III.    Causal Nexus

Finally, we turn to Djerf's claim that the Arizona courts impermissibly refused to consider mitigating evidence of his difficult family background because it lacked a causal connection to his crimes. We focus on the Arizona Supreme Court's de novo review of Djerf's sentence and consider the trial judge's rulings only to the extent that they were "adopted or substantially incorporated" by the higher court. *McKinney*, 813 F.3d at 819. We have addressed many causal nexus appeals in recent years and need not repeat the history and nuance of this doctrine, which is extensively detailed in other decisions. *See, e.g.*, *id.* at 811–24. In short, the Supreme Court has clearly established that a sentencing court must consider all mitigating evidence; state law may not, for example, impose a threshold requirement that a defendant demonstrate a causal connection to the offense. *See Smith v. Texas*, 543 U.S. 37, 43–49 (2004) (per curiam); *Tennard v. Dretke*, 542 U.S. 274, 283–88 (2004); *Penry v. Lynaugh*, 492 U.S. 302, 319–28 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *Eddings*, 455 U.S. at 110–17; *Lockett v. Ohio*, 438 U.S. 586, 597–609

(1978). Of course, the sentencing court is free to assign little weight to mitigating evidence, but such evidence may not be stripped of all weight as a matter of law. *See Harris v. Alabama*, 513 U.S. 504, 512 (1995). However, relief is only available when a causal nexus error was prejudicial—that is, when it was not harmless. *McKinney*, 813 F.3d at 821–22. We assume, without deciding, that the Arizona Supreme Court committed a causal nexus error here and move directly to the harmlessness inquiry.

The question is whether the Arizona Supreme Court's refusal to consider Djerf's family background evidence "had substantial and injurious effect or influence in determining" his sentence. *Id.* at 822 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). We review aggravating factors proven by the State and other mitigating evidence presented to the sentencing court, then we ask whether consideration of the improperly ignored evidence "would have had a substantial impact on a capital sentencer who was permitted to evaluate and give appropriate weight to it." *Id.* at 823. We conclude here it would not—any error was harmless.

The State established three aggravating factors for each of the victims: Djerf committed each murder expecting receipt of something of pecuniary value; the murders were committed "in an especially heinous, cruel or depraved manner"; and the murders were committed in tandem. Ariz. Rev. Stat. § 13-703(F)(5), (6), (8) (1996). Because one of the victims was under eighteen, the State established another aggravating factor for his murder. *Id.* § 13-703(F)(9). Each of these factors is significant, but the undisputed facts substantiating the "heinous, cruel, or depraved" finding are especially powerful: with clear premeditation and preparation, Djerf imposed appalling psychological and physical suffering upon four strangers from a single family

before killing them in cold blood. The State's aggravation case stands out as one of, if not the, strongest we have reviewed in recent years.

On the other hand, Djerf's mitigation case was, as he admits on appeal, quite meager. Djerf was twenty-three years old at the time of the crimes, did not resist arrest, was mostly well-behaved for the duration of his post-arrest detention, and purported to accept responsibility and feel remorse for his conduct. The trial judge concluded that Djerf's relative youth was not a mitigating factor because there was no indication that he lacked substantial judgment or an ability to appreciate the consequences of his actions. Djerf's compliance with arresting officers was likewise not mitigating because, by that time, his friends were cooperating with the police and he had no other option. Subsequent statements by Djerf blaming Albert Luna for the crime and indicating that he could envision himself killing again undermined his purported acceptance of responsibility and remorse. So did the tactical justifications for his guilty plea. The trial judge found that Djerf had adjusted to confinement since his arrest, but several disciplinary infractions kept that factor from warranting leniency. The trial judge also concluded that Djerf did not suffer from any psychological disorders, noting that he expressly disclaimed any such problems. None of these considerations warranted leniency.

On direct appeal, Djerf challenged the court's findings regarding age, remorse, and acceptance of responsibility. *Djerf*, 959 P.2d at 1288–90. The Arizona Supreme Court largely reiterated the trial judge's reasoning and reached the same conclusions, finding that these considerations did not warrant leniency. *Id.*

That brings us to the evidence of a difficult family background—evidence that we assume the Arizona courts improperly ignored. Djerf's mother experienced some complications during pregnancy and childbirth. She recalled her son falling on his head as a toddler, though Djerf's father does not recall any injuries. Neither parent was especially affectionate or doting with their son, and they divorced when he was approximately six years old; Djerf maintained relationships and alternately lived with each parent in the subsequent years. Both parents raised their voice on occasion, and the mother's new husband once pushed Djerf up against a wall. However, there is no evidence that Djerf experienced physical or emotional abuse throughout his childhood. His mother recalled him rarely interacting with friends, while his father thought he had "normal" relationships until high school. At that point, his father thought Djerf became "more of a loner," although he regularly spent time with friends. Djerf's mother and sister insisted that Djerf's father drank heavily, though Djerf did not recall ever seeing him intoxicated. His sister also remembered their father as "loving" and a "good provider." She recalled a time from their childhood when Djerf handcuffed her, but she did not recall anything else notable about the incident. Djerf dropped out of high school, but later obtained his diploma.

We have previously found a causal nexus error to be harmless when there is "overwhelming" evidence of aggravating circumstances and proffered mitigation evidence is "limited" or "relatively minor." *Murray v. Schriro*, 882 F.3d 778, 815–16 (9th Cir. 2018); *Apelt v. Ryan*, 878 F.3d 800, 840 (9th Cir. 2017); *Greenway v. Ryan*, 866 F.3d 1094, 1100 (9th Cir. 2017) (per curiam). That is precisely the case here. This is not an instance where improperly ignored mitigation evidence addressed

"sustained, severe childhood abuse" "beyond the comprehension and understanding of most people." *McKinney*, 813 F.3d at 823. In *Poyson v. Ryan*, there was evidence of repeated physical and emotional childhood abuse, sexual assault, coerced alcohol and drug use, developmental delays, the sudden death of a close parental figure, and severe head injuries resulting in headaches and loss of consciousness. 879 F.3d 875, 892–93 (9th Cir. 2018). Despite significant aggravating factors, we concluded that exclusion of this "particularly compelling" mitigation evidence was prejudicial because it may have persuaded the sentencing court to impose a non-capital sentence. *Id.* The mitigating evidence here is categorically less compelling, and the aggravating circumstances are more severe.

This is also not a situation where the evidence was objectively "important" and "interlinked" with other theories of mitigation, such that improperly excluding that evidence deprived all other mitigation evidence of persuasive force. *See Spreitz v. Ryan*, 916 F.3d 1262, 1279–80 (9th Cir. 2019). We do not mean to suggest that Djerf experienced an idyllic childhood. Rather, there was no evidence of severe abuse, trauma, or other troubling experiences that might warrant leniency in light of overwhelming aggravating circumstances. We have no choice but to conclude that any causal nexus error committed by the Arizona Supreme Court was harmless.

## CONCLUSION

The record fails to establish that Djerf's pre-trial counsel were incompetent or provided constitutionally deficient representation. This conclusion defeats Djerf's challenges to his waiver of counsel and guilty pleas, as both claims are premised on constitutionally inadequate representation. Because there is not a reasonable probability that state post-

conviction proceedings would have turned out differently if Djerf had advanced a pre-trial ineffective assistance of counsel claim, we cannot excuse the procedural default of that claim.  The state court reasonably concluded that sentencing counsel was not ineffective, and the district court did not abuse its discretion by denying Djerf's request for an evidentiary hearing on that claim.  Finally, we conclude any causal nexus error during Djerf's sentencing was harmless.

**AFFIRMED.**[6]

---

[6] After oral argument, the Supreme Court granted certiorari in *McKinney v. Arizona*, No. 18-1109, 2019 WL 936074 (June 10, 2019), to address the appropriate procedures for resentencing after a capital sentence is vacated in light of a prejudicial *Eddings* error.  Djerf moved to stay these proceedings pending resolution of that case.  Dkt. 119.  Because no resentencing is warranted here, the motion is **DENIED**.